UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

THE CAYUGA INDIAN NATION OF NEW YORK, BY
ITS CHIEFS, FRANKLIN PATTERSON, JAMES
LEAFFE, VERNON ISAAC, KENNETH JOHN, AND
FRANK BONAMIE, Individually and as Members
of the Cayuga Indian Nation of New York

                               Plaintiffs,

                v.

HUGH L. CAREY, as Governor of the State of
New York; NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES, THOMAS A. COUGHLIN,
III, as Commissioner of Correctional Services;
NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL
CONSERVATION, ROBERT F. FLACKE, as Commissioner
of Environmental Conservation; NEW YORK STATE
DEPARTMENT OF HEALTH, DAVID A. AXELROD, M.D.,
as Commissioner of Health; NEW YORK STATE
DEPARTMENT OF MENTAL HYGIENE, ROBERT ABRAMS,
Attorney General; NEW YORK STATE DEPARTMENT
OF TRANSPORTATION, WILLIAM C. HENNESSY, as
Commissioner of Transportation; NEW YORK
STATE DIVISION FOR YOUTH, FRANK A. HALL, as
Director; DIVISION OF NEW YORK STATE POLICE
OF THE EXECUTIVE DEPARTMENT OF THE STATE OF
NEW YORK, WILLIAM G. CONNELIE, as Superintendent;
DIVISION OF GENERAL SERVICES OF THE EXECUTIVE
DEPARTMENT OF THE STATE OF NEW YORK, JAMES C.
O'SHEA, as Commissioner; NEW YORK STATE DIVISION
OF MILITARY AND NAVAL AFFAIRS, MAJOR GENERAL
VITO J. CASTELLANO, as Chief of Staff to the
Governor; NEW YORK STATE EDUCATION DEPARTMENT,
GORDON M. AMBACH, as Commissioner; NEW YORK
STATE ENVIRONMENTAL FACILITIES CORPORATION;
ROBERT F. FLACKE, as Chairman of the Board
of Directors, DAVID A. AXELROD, M.D., as a
Director, BASIL A. PATERSON, as a Director,
WALTER J. HINCKLEY, as a Director, JOSEPH A.
CIMINO, M.D., as a Director, MARTIN S. BAKER,
as a Director, and JOSEPH B. SHINEL, as a
Director; NEW YORK STATE FACILITIES DEVELOP-
MENT CORPORATION, JOSEPH CROOK, as Executive
Director; NEW YORK STATE OFFICE OF PARKS AND
RECREATION, ORIN LEHMAN, as Commissioner of
Parks and Recreation; NEW YORK STATE THRUWAY
AUTHORITY, GERALD DUMMINS, as Member of the
Board of Directors, LOUISE M. SUNSHINE, as
Member of the Board of Directors, CHARLES
LANIGAN, as Member of the Board of Directors;

) Civil Action
) No. 80-CV-930
)
)
)
)
)
)
) COMPLAINT
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

POWER AUTHORITY FOR THE STATE OF NEW YORK,              )
JOHN S. DYSON, as Trustee, GEORGE L. INGALLS,           )
as Trustee, RICHARD M. FLYNN, as Trustee,               )
ROBERT I. MILLONZI, as Trustee, and FREDERICK           )
CLARK as Trustee; STATE UNIVERISTY OF NEW YORK,         )
GORDON M. AMBACH, as Commissioner; THE COUNTY OF        )
SENECA, NEW YORK, HARRY F. AMIDON, Chairman of          )
Board of Supervisors; THE COUNTY OF CAYUGA, NEW         )
YORK, W. BERNARD CRAINE, Chairman of County             )
Legislature; THE TOWN OF SENECA FALLS, NEW YORK,        )
FRANK A. SARACINO, Supervisor; THE TOWN OF FAYETTE,     )
NEW YORK, JAMES SOMERVILLE, Town Supervisor; THE        )
TOWN OF VARICK, NEW YORK, LEO DAVIDS, JR.,              )
Supervisor; THE TOWN OF AURELIUS, NEW YORK,             )
MARILYN PROULX, Clerk; THE TOWN OF LEDYARD, NEW         )
YORK, DAVID BROOKS, Clerk; THE TOWN OF MONTEZUMA,       )
NEW YORK, JACQUELINE SMITH, Town Clerk; THE TOWN        )
OF SPRINGPORT, NEW YORK, NORMA BILACK, Clerk;           )
THE VILLAGE OF SENECA FALLS, NEW YORK, ROBERT           )
FREELAND, Mayor; THE VILLAGE OF AURORA, NEW YORK,       )
DAVID BROOKS, Clerk; THE VILLAGE OF CAYUGA,             )
NEW YORK: MARILYN SALATO, Clerk; THE VILLAGE OF         )
UNION SPRINGS, NEW YORK, ANN W. RYAN, Village           )
Clerk of Union Springs; WILLIAM H. BANCROFT;           )
FREDERICK & KENNETH GABLE; MARY BARNES; RALPH E.        )
& MARI B. MOSHER; WESLEY & DOROTHY ENGST; W.W.          )
& F.H. PATTERSON, JR.; W.W. PATTERSON, INC.;            )
R.N. PATREAL CORPORATION; JOHN & VICTORIA              )
STRECKER; ANNA RINDFLEISCH; CLIFFORD WALDRON;           )
GEORGE & ARLENE SAXTON; DAVID G. PALMER;               )
BENJAMIN & VIRGINIA SWAYZE; EDWIN & ELLEN KELLY;        )
RANDY DEAL; JOHN L. KING; BRUCE STAHL; DAVID L.         )
KOCH; GEORGE G. MARKEL; PAUL PERKINS; GRACE &           )
GORDON LAMBERT; WILLIAM & JESSICA OLSOWSKE;             )
FLOYD & MARJORIE BAKER; HOWARD & JEANNE BIRDSALL;       )
WILLIS M. COSAD; WILLIS M. HOSTER; EMERSON & LEAH       )
O'CONNOR; MILLARD & ALBERTA STUCK ; LEON & GRACE        )
MARTIN; LOUIS & JEANNE FREIER; FERDINARD L. &           )
JUNE NICANDRI; TED W. O'HARA; N.Y. TELEPHONE CO.;       )
N.Y.S. ELECTRIC & GAS CO.; LEHIGH VALLEY RR;            )
CONSOLIDATED RAIL CORP.; AMERICAN TELEPHONE &           )
TELEGRAPH; WELLS COLLEGE; EISENHOWER COLLEGE OF         )
THE ROCHESTER INSTITUTE OF TECHNOLOGY; GEORGE G.        )
SOUHAN; J. SOUHAN & SONS, INC.; MILLER BREWING          )
COMPANY,                                                )
                                    Defendants.         )
                                                        )
_____

                        COMPLAINT

## I.   NATURE OF THE ACTION

1.   This is a defendant class action to declare plaintiffs' current ownership of and right to possess their reserved lands in the State of New York (hereinafter referred to as "The Original Reservation" lands), the right to which is conferred by federal law and which is subject to restrictions against alienation.  Plaintiffs also seek relief restoring them to possession of their Original Reservation lands, trespass damages for the period of their dispossession, and restitution of the value of all timber, oil, gas, coal, other minerals or any other matter of value which has been extracted or permanently removed from said land.  Defendants are sued individually and as representatives of all similarly situated  persons pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## II.   JURISDICTION AND VENUE

2.   The jurisdiction of the court is invoked pursuant to 28 U.S.C., Section 1331, Section 1337, and Section 1362.  The amount in controversy exceeds $10,000 exclusive of interest and costs with respect to each member of defendant class.  Venue is invoked in the Northern District pursuant to 28 U.S.C. 1392.

3.   Plaintiffs' claims for relief arise under Article IX of Articles of Confederation, the Continental Congress' Proclamation of September 22, 1783, the Treaty of Fort Stanwix (7 Stat. 15, 1784), the Treaty of Canandaigua of 1794 (7 Stat. 44), the Commerce Clause, Art. I, Sec. 8, United States Constitution, 25 U.S.C., Section 177 and its predecessor, the 1790 Non-Intercourse Act (1 Stat. 329, 330), Article 37 of the 1777 New York Constitution, and the common law.

## III.   PARTIES

4.   Plaintiff Cayuga Indian Nation of New York is an Indian Nation or Tribe recognized by the United States.  It is without a reservation but has a principal situs in the State

of New York.  Plaintiffs at the time of the acts complained of
herein, constituted the Cayuga Nation which occupied the
subject lands in New York State since time immemorial.  Plaintiffs
are the direct successors in interest to the said Cayuga Nation.
At all times complained of herein and to the present time,
plaintiffs have continuously maintained tribal relations and
are recognized by the Federal Government as the Cayuga Nation of
the Six Nation Iroquois Confederacy.

     5.    Defendant <u>Hugh L. Carey</u> is the <u>Governor</u> of the
State of New York and as such the chief administrative and
executive officer of the State empowered to hold title and
other interests in real property on behalf of the State and
responsible for regulation of the use and occupancy thereof.

     6.    Defendant <u>New York State Department of Correctional
Services</u> is a <u>Department</u> of the State of New York and as such
has jurisdiction over and is empowered to hold title and other
interests in real property on behalf of the State and to regulate
the use and occupancy thereof; Defendant <u>Thomas A. Coughlin, III</u>,
is a <u>Commissioner</u> of the New York Department of Correctional
services, and as such is the chief administrative and executive
official of the <u>Department</u> empowered to hold title and other
interests in real property on behalf of the State and is
responsible for regulation of the use and occupancy thereof.

     7.    Defendant <u>New York Department of Environmental
Conservation</u> is a <u>Department</u> of the State of New York and
as such has jurisdiction over and is empowered to hold title
and other interests in real property on behalf of the State
and to regulate the use and occupancy thereof; Defendant
<u>Robert F. Flacke</u> is the <u>Commissioner</u> of the New York State

-4-

Department of Environmental Conservation, and as such is the chief administrative and executive official of the Department empowered to hold title and other interests in real property on behalf of the State and is responsible for regulation of the use and occupancy thereof.

8.  Defendant New York State Department of Health is a Department of the State of New York and as such has jurisdiction over and is empowered to hold title and other interests in real property on behalf of the State and to regulate the use and occupancy thereof; Defendant David A. Axelrod, M.D. is the Commissioner of the New York State Department of Health, and as such is the chief administrative and executive official of the Department empowered to hold title and other interests in real property on behalf of the State and is responsible for regulation of the use and occupancy thereof.

9.  Defendant New York State Department of Mental Hygiene is a Department of the State of New York and as such has jurisdiction over and is empowered to hold title and other interests in real property on behalf of the State and to regulate the use and occupancy thereof.

10.  Defendant New York State Division for Youth is a Division of the State of New York and as such has jurisdiction over and is empowered to hold title and other interests in real property on behalf of the State and to regulate the use and occupancy thereof; Defendant Frank A. Hall is the Director of the New York State Division for Youth, and as such is the chief administrative and executive official of the Division empowered to hold title and other interests in real property on behalf of the State and is responsible for regulation of the use and occupancy thereof.

11.    Defendant <u>Division of New York State Police of</u> <u>the Executive Department of the State of New York</u> is a <u>Division</u> of the State of New York and as such has jurisdiction over and is empowered to hold title and other interests in real property on behalf of the State and to regulate the use and occupancy thereof; Defendant <u>William G. Connelie</u> is the <u>Superintendent</u> of the <u>Division</u> of New York State Police of the Executive Department of the State of New York, and as such is the chief administrative and executive official of the <u>Division</u> empowered to hold title and other interests in real property on behalf of the State and is responsible for regulation of the use and occupancy thereof.

12.    Defendant <u>Division of General Services of the</u> <u>Executive Department of the State of New York</u> is a <u>Division</u> of the State of New York and as such has jurisdiction over and is empowered to hold title and other interests in real property on behalf of the State and to regulate the use and occupancy thereof; Defendent <u>James C. O'Shea</u> is the <u>Commissioner</u> of the Division of General Services of the Executive Department of the State of New York, and as such is the chief administrative and executive official of the <u>Division</u> empowered to hold title and other interests in real property on behalf of the State and is responsible for regulation of the use and occupancy thereof.

13.    Defendant <u>New York State Division of Military</u> <u>and Naval Affairs</u> is a <u>Division</u> of the State of New York and as such has jurisdiction over and is empowered to hold title and other interests in real property on behalf of the State and to regulate the use and occupancy thereof; Defendant <u>Major General</u> <u>Veto J. Castellano</u> is the <u>Chief of Staff to the Governor</u>, and as such is the chief administrative and executive official of the

Division empowered to hold title and other interests in real
property on behalf of the State and is responsible for regulation
of the use and occupancy thereof.

14.   Defendant New York State Education Department is
a Department of the State of New York, and as such has juris-
diction over and is empowered to hold title and other interests
in real property on behalf of the State and to regulate the
use and occupancy thereof; Defendant Gordon M. Ambach is the
Commissioner of the New York State Education Department, and as
such is the chief administrative and executive official of the
Department empowered to hold title and other interests in real
property on behalf of the State and is responsible for regulation
of the use and occupancy thereof.

15.   Defendant New York State Environmental Facilities
Corporation is a Corporation of the State of New York and as
such as jurisdiction over and is empowered to hold title and
other interests in real property on behalf of the State and to
regulate the use and occupancy thereof; Defendant Robert F. Flacke
is the Chairman of the Board of Directors of the New York State
Environmental Facilities Corporation, and as such is empowered,
along with the other members of the Board, to hold title and other
interests in real property on behalf of the State and has
jurisdiction over and is responsible for the regulation of the use
and occupancy thereof; Defendant David A. Axelrod, M.D. is a
a Director of the New York State Environmental Facilities
Corporation, and as such is empowered, along with the other members
of the Board of Directors, to hold title and other interests
in real property on behalf of the State and has jurisdiction over
and is responsible for the regulation of the use and occupancy
thereof; Defendant Basil A. Paterson is a Director of the New York

State Environmental Facilities Corporation, and as such is empowered, along with the other members of the Board of Directors, to hold title and other interests in real property on behalf of the State and has jurisdiction over and is responsible for the regulation of the use and occupancy thereof; Defendant Walter J. Hinckley is a Director of the New York State Environmental Facilities Corporation, and as such is empowered, along with the other members of the Board of Directors, to hold title and other interests in real property on behalf of the State and has jurisdiction over and is responsible for the regulation of the use and occupancy thereof; Defendant Joseph A. Cimino, M.D. is a Director of the New York State Environmental Facilities Corporation, and as such is empowered, along with the other members of the Board of Directors, to hold title and other interests in real property on behalf of the State and has jurisdiction over and is responsible for the regulation of the use and occupancy thereof; Defendant Martin S. Baker is a Director of the New York State Environmental Facilities Corporation, and as such is empowered, along with the other members of the Board of Directors, to hold title and other interests in real property on behalf of the State and has jurisdiction over and is responsible for the regulation of the use and occupancy thereof; Defendant Joseph B. Shinal is a Director of the New York State Environmental Facilities Corporation, and as such is empowered, along with the other members of the Board of Directors, to hold title and other interests in real property on behalf of the State and has jurisdiction over and is responsible for the regulation of the use and occupancy thereof.

16.   Defendant New York State Facilities Development Corporation is a Corporation of the State of New York and as such has jurisdiction over and is empowered to hold title and other interests in real property on behalf of the State and to regulate the use and occupancy thereof; Defendant Joseph Crook is the Executive Director of the New York State Facilities Development Corporation, and as such is the chief administrative and executive official of the Corporation empowered to hold title and other interests in real property on behalf of the State and is responsible for regulation of the use and occupancy thereof.

17.   Defendant New York State Office of Parks and Recreation is an Office of the State of New York and as such has jurisdiction over and is empowered to hold title and other interests in real property on behalf of the State and to regulate the use and occupancy thereof; Defendant Orin Lehman is the Commissioner of the New York State Office of Parks and Recreation, and as such is the chief administrative and executive official of the Office empowered to hold title and other interests in real property on behalf of the State and is responsible for regulation of the use and occupancy thereof.

18.   Defendant New York State Thruway Authority is an Authority of the State of New York and as such has jurisdiction over and is empowered to hold title and other interests in real property on behalf of the State and to regulate the use and occupancy thereof; Defendant Gerald Cummins is the Chairman of the Board of Directors of the New York State Thruway Authority

and as such is empowered, along with the other members of the
Board, to hold title and other interests in real property on
behalf of the State and has jurisdiction over and is responsible
for the regulation of the use and occupancy thereof; Defendant
Louise M. Sunshine is the Vice Chairman of the Board of Directors
of the New York State Thruway Authority and as such is empowered,
along with the other members of the Board, to hold title and
other interests in real property on behalf of the State and has
jurisdiction over and is responsible for the regulation of the
use and occupancy thereof; Defendant Charles Lanigan is the
Treasurer of the Board of Directors of the New York State Thruway
Authority and as such is empowered, along with the other members
of the Board, to hold title and other interests in real property
on behalf of the State and has jurisdiction over and is
responsible for the regulation of the use and occupancy thereof.

19.    Defendant Power Authority for the State of New
York is an Authority of the State of New York and as such has
jurisdiction over and is empowered to hold title and other
interests in real property on behalf of the State and to regulate
the use and occupancy thereof; Defendant John S. Dyson is a
Trustee of the Power Authority for the State of New York, and
as such is empowered, along with the other Trustees, to hold
title and other interests in real property on behalf of the
State and has jurisdiction over and is responsible for the
regulation of the use and occupancy thereof; Defendant George L.
Ingalls is a Trustee of the Power Authority for the State of
New York and as such is empowered, along with the other Trustees,

-10-

to hold title and other interests in real property on behalf of the State and has jurisdiction over and is responsible for the regulation of the use and occupancy thereof; Defendant Richard M. Flynn is a Trustee of the Power Authority for the State of New York and as such is empowered, along with the other Trustees, to hold title and other interests in real property on behalf of the State and has jurisdiction over and is responsible for the regulation of the use and occupancy thereof; Defendant Robert I. Millonzi is a Trustee of the Power Authority for the State of New York, and as such is empowered, along with the other Trustees, to hold title and other interests in real property on behalf of the State and has jurisdiction over and is responsible for the regulation of the use and occupancy thereof; Defendant Frederick Clark is a Trustee of the Power Authority for the State of New York and as such is empowered, along with the other Trustees, to hold title and other interests in real property on behalf of the State and has jurisdiction over and is responsible for the regulation of the use and occupancy thereof.

      20.   Defendant State University of New York is an Agency of the State of New York and as such has jurisdiction over and is empowered to hold title and other interests in real property on behalf of the State and to regulate the use and occupancy thereof; Defendant Gordon M. Ambach is the Commissioner of the Education Department of the State of New York and as such is empowered to hold title and other interests in real property on behalf of the State and to regulate the use and occupancy thereof.

21.  Defendant Seneca County is a political subdivision of
the State of New York, and as such has jurisdiction over and
is empowered to hold title and other interests in real property
and is empowered to regulate the use and occupancy thereof; and
has the authority to impose and collect taxes on the property
and has collected taxes on that property comprising the Original
Cayuga Reservation.  Defendant Harry F. Amidon is the Chairman
of the Board of Supervisors and as such is the agent for said
County, and is responsible for the regulation, use, occupancy of
property and the collection of property tax for said County.

22.  Defendant Cayuga County is a political subdivision of
the State of New York, and as such has jurisdiction over and
is empowered to hold title and other interests in real property
and is empowered to  regulate the use and occupancy thereof; and
has the authority to impose and collect taxes on the property
and has collected taxes on that property comprising the Original
Cayuga Reservation.  Defendant W. Bernard Craine is the Chairman
of the County Legislature and as such is the agent for said
County, and is responsible for the regulation, use, occupancy of
property and the collection of property tax for said County.

23.  Defendant Miller Brewing Company is a Wisconsin
corporation duly authorized to do business in the State of New
York.  Defendant Miller Brewing Company is and has been engaged
in drilling for gas or other matter  of value upon lands within
the Original Reservation.  Said drilling by defendant Miller
Brewing Company has resulted in the extraction or removal of
valuable materials from the plaintiffs' reserved lands.  Defendant
Miller Brewing Company asserts a right to continue to engage in
such activities in the future.

24.  All of the individual defendants who hold property
in the name of or on behalf of the State of New York or any of
its agencies, which property is rightfully owned by the plaintiffs,

are acting beyond the scope of their statutory authority, or if
they are acting within their statutory authority, the exercise of
that authority is void as being in contravention of federal law.
As a result, these individuals are amenable to suit in this
Court, notwithstanding the doctrine of sovereign immunity or
the Eleventh Amendment of the United States Constitution.  Further-
more, to the extent this action is construed as a suit against
the State of New York, it is amenable to suit in this Court by
virtue of 28 U.S.C. Section 1362.

25.  The named defendants are sued both individually
and as representatives of all other persons who assert an
interest in any portion of the Original Reservation lands of
approximately sixty-four thousand (64,000) acres (area as shown
on Exhibit A), with the exception of any member of the Cayuga
Nation of New York who may reside therein and plaintiffs therein.

26.  The named defendants and each member of the
defendant class assert an interest in lands in the State of New
York which are the subject matter of this action and have an
interest in keeping plaintiffs out of possession of the same.

27.  The number of members of the above-described class
of defendants exceeds 7,000 persons and is thus so numerous
that joinder of all members is impractical.  All relevant
questions of law and fact are common to the members of the class
of defendants and the defenses of the named representative parties
are typical of the defenses of the class.  The named defendants
include the major public claimants of the subject land and
representative private claimants with claims in each county.  The
named defendants will fairly and adequately represent the
interests of the class.

28.   The prosecution of separate actions against indi-
vidual members of the defendant class would create a risk of
inconsistent or varying judgments which would, as a practical
matter, substantially impair the ability of the other class
members, not parties to the judgments, to protect their interests.

29.   The questions of law and fact common to members
of the class predominate over questions affecting only individual
members and a defendant class action is superior to other pro-
cedures for the fair and efficient adjudication of the contro-
versy.

IV.   DESCRIPTION OF THE SUBJECT LAND

30.   From time immemorial to the time of the acts
complained of herein, the Cayuga Nation owned and occupied
approximately 3,000,000 plus acres of land in New York State,
as shown on the map annexed as Exhibit B.   The land subject to
this action includes only the Cayuga's Original Reservation lands
of 64,015 acres (see Exhibit A) reserved for the Cayugas in the
1789 Treaty transaction (see Exhibit C) with the State of New
York.   The Original Reservation lands are described as follows:

> "The Cayugas shall of the ceded lands hold to
> themselves and to their posterity forever, for
> their own use and cultivation but not to be sold,
> leased or in any other manner aliened or disposed
> of to others, All that tract of land beginning
> at the Cayuga Salt Spring on the Seneca River and
> running thence southerly to intersect the middle
> of a line to be drawn from the outlet of Cayuga
> to the outlet of Waskongh Lake and from the said
> place of intersection southerly the general
> course of the eastern bank of the Cayuga Lake,
> thence westerly to intersect a line running on
> the west side of the Cayuga Lake at the mean
> distance of three miles from the western branch
> thereof; and from the said point of intersection
> along the said line so running on the west side
> of the Cayuga Lake to the Seneca River, thence

- 14 -

down the said river to the Cayuga Lake, thence
through the said Lake to the outlet thereof,
thence farther down the said river to the place
of beginning, so as to comprehend within the
limits aforesaid and exclusive of the water of
Cayuga Lake the quantity one hundred square miles;
also the place in the Seneca River at or near a
place called Skayes, where the Cayugas have
heretofore taken eel, and a competent piece of
land on the southern side of the river at the
said place sufficient for the said Cayugas to
land and encamp on and to cure their eel,
excepted nevertheless out the said lands or
reserved one mile squire at the Cayuga Ferry."

The plaintiffs do not at this time include in this complaint

the aboriginal land area which was taken from them by the

State of New York in the 1789 Treaty.  That land area shall be

the subject of another complaint to be filed by the plaintiffs

in the near future.  It has been kept as a separate action to

avoid complicating an already complicated action.

V.   FACTS

A.   Cayuga Relations With The Federal Government

31.   During the United States' colonial period, the British Crown pursued a policy of protecting Indian tribes in the peaceful possession of their land and implemented this policy by establishing boundary lines between the tribes and the American colonies.  On November 5, 1768, such a line between the colonies and the Six Nations -- a confederation of six Indian Nations including the Oneidas, Tuscaroras, Mohawks, Onondagas, Cayugas, and Senecas -- was agreed upon in a treaty concluded at Fort Stanwix.  The line began in northern New York near the eastern end of Lake Ontario, ran south to the Delaware River, thence west to the Allegheny River, and thence west along the Ohio to the mouth of the Tennessee River.  That part of the line north of Pennsylvania also constituted the southern half of the eastern boundary of the Cayuga aboriginal territory.

32.   At the outset of hostilities between the British Crown and the colonies, the Six Nations declared their intention to remain neutral.  The Treaty of Paris in 1783, concluding the American Revolution, made no provision for the Indian allies of either Britain or the United States.  Thus, the Continental Congress took separate steps to adjust relations with the Indian tribes, pursuant to its delegated authority under Art. IX, Cl. 1, 4, of the Articles of Confederation which provided:

> The United States in Congress assembled shall have the sole and exclusive right and power of determining on peace and war, except in the cases mentioned in the sixth Article [having to do with the invasion of a state] ... entering into treaties and alliances ... of regulating the trade and managing all affairs with

the Indians, not members of the States,
provided that the legislative right of
any State within its own limits be not
infringed or violated.

33.   As a first step Congress created Indian Departments
to implement its Indian policy generally and make peace with
the formerly hostile tribes, and to preserve peaceful relations,
it passed a Proclamation on September 22, 1783, which reads:

Whereas by the ninth of the Articles of
Confederation, it is among other things
declared, that the United States in
Congress shall have the sole and exclu-
sive right and power of regulating the
trade, and managing all affairs with
the Indians, not members of any State,
provided that the Legislative right of
any State, within its own limits, be not
infringed or violated.  And whereas it
is essential to the welfare and inter-
est of the United States as well as neces-
sary for the maintenance of harmony
and friendship with the Indians, not mem-
bers of any of the States, that all cause
of quarrel or complaint between them and
the United States, or any of them, should
be removed and prevented:  Therefore the
United States and Congress assembled have
thought proper to issue their proclamation,
and they do hereby prohibit and forbid
all persons from making settlements on
lands inhabited or claimed by Indians,
without the limits or jurisdiction of
any particular State, and from purchas-
ing or receiving any gift or cession of
such lands or claims without the express
authority and directions of the United
States in Congress assembled.  And it is
moreover declared, that every such pur-
chase or settlement, gift or settlement
not having the authority aforesaid, is
null and void, and that no right or title
will accrue in consequence of any such
purchase, gift, cession or settlement.
Done in Congress, at Princeton, this
twenty second day of September, in the
year of our Lord one thousand seven
hundred and eighty three, and of our sov-
ereignty and independence the eight.
                    [Emphasis added]

- 17 -

34.   In August 1784, federal treaty commissions, in the course of inviting the Cayugas to treat with the United States, informed them "...that a treaty with an individual state, without the sanction of Congress, could be of no validity." At the same time, the commissioners advised the Governor of New York of their intention to treat with the Six Nations and suggested that whatever business the State might have with the tribes would be "...more properly transacted at the same time with and in subordination to the General Treaty."  New York did not reply to this invitation but its representatives attended the federal treaty negotiations at Fort Stanwix as observers.

35.   As instructed by the Continental Congress, the federal commissioners concluded the Treaty of Fort Stanwix (7 Stat. 15) on October 22, 1784, which specifically outlined in Article III, the boundaries of the Six Nations, one of which was the Cayuga Nation.

36.   Notwithstanding the admonition  of the Federal Government, the State of New York on February 25, 1789, concluded a "treaty" with the Cayuga Indian Nation in Albany, New York. The Cayugas "ceded" all of their lands to the People of the State of New York reserving for their own tribal use the 64,015 acres identified in this action as the Original Reservation.  (A copy of said "treaty" is attached as Exhibit C).

37.   In 1790, Congress passed the Indian Trade and Intercourse Act which reasserted exclusive federal jurisdiction over Indian land transactions.  Act of July 22, 1790, 1 Stat. 329, 330.  This act has been continuously in force since that time and was reenacted in the Acts of March 1, 1793, 1 Stat. 329, 300; Act of July 22, 1796, 1 Stat. 469, 472; Act of

March 3, 1799, 1 Stat. 743, 746; Act of March 30, 1802, 2 Stat.
139, 143. Act of June 30, 1834, 4 Stat. 729, 730; Rev. Stat.
Section 2116. This act in pertinent part provides that:

> No purchase, grant, lease or other
> conveyance of land, or of any title
> or claim thereto, from any Indian
> nation or tribe of Indians, shall be
> of any validity in law or equity,
> unless the same be made by treaty
> or conveyance entered into pursuant
> to the Constitution. (25 U.S.C. 177.)

38.   On November 11, 1794 (7 Stat. 44), the Six Nations
concluded a treaty with the United States at Canandaigua.
Article II of the Treaty acknowledged, _inter alia_, the lands
reserved to the Cayuga Nation in its "treaty" with New York State.
The United States promised the Cayuga Nation that the lands
would remain theirs until the Cayugas "chose to sell the same to
the People of the United States who have the right to purchase."

### B.   Cayuga Relations With New York State

39.   The treaties with the State of New York were the
ones which established and terminated the Cayugas' occupancy
to the Original Reservation in New York State. By the state
"treaties" dated February 25, 1789 (Exhibit C), July 27, 1795
(Exhibit D), and May 30, 1807 (Exhibit E), the Cayuga Nation
of Indians ceded to the State of New York all of their lands
within that state. In consideration for these cessions, they
received a total of Eight Thousand, Seven Hundred Twenty-Five
Dollars ($8,725.00) cash plus an annuity of Two Thousand, Three
Hundred Dollars ($2,300.00).

40.   The Treaty of February 25, 1789, established the
Original Reservation, and "ceded" to New York all of the aboriginal
lands in the state. The aboriginal lands consisted of approxi-
mately three million (3,000,000) acres. The Original Reservation

was bounded on the north by the Seneca River, on the east and west by lines generally following the course of Cayuga Lake, being three (3) miles distant therefrom, and on the south by a line running easterly through the lake, consisting of approximately one hundred (100) square miles surrounding the northern part of Cayuga Lake.  The Cayugas were allowed to occupy this reserved land until July 27, 1795, at which time New York State determined that the Cayugas did not need this entire reservation and proceeded to take it from the Cayugas, except for a three (3) mile square parcel on the eastern shore of Cayuga Lake.  The last parcel of land was taken by New York in 1807, pursuant to the "treaty" of 1807, for the lump sum of Four Thousand, Eight Hundred Dollars ($4,800.00).

41.   In 1790, the United States Congress enacted into law, the predecessor of what is now Section 177 of Title 25, known as the Trade and Intercourse Act.  This Act made it unlawful for any individual or state to deal with the Indians without the consent and approval of the United States Government.

42.   On June 16, 1795, in reply to an inquiry dated June 13, 1795, by Secretary of War Pickering, William Bradford, Attorney General of the United States, issued an opinion on the question of whether the State of New York had a right to purchase from the Six Nations or from any of the individual tribes their lands in New York without the participation of the Federal Government.  The Attorney General stated that under the Act of March 1, 1793 (the version of the Trade and Intercourse Act then in effect), no sale of land by an Indian tribe was valid unless effectuated by a treaty or convention entered into by the Federal Government.  He further stated that nothing contained

in the letter of inquiry by the Secretary would take the sales
to New York out of the general prohibition of the law.

43.   Bradford noted that the treaties between New York
State and the various tribes of the Six Nations, entered into
before the adoption of the Constitution, granted to the State
the right of preemption over the lands still owned by the tribes.
He concluded that:

> Subject to this right they are still
> the lands of those Nations, and their claims
> to them, it is conceived cannot be extin-
> guished but by a treaty holden under the
> authority of the United States, and in the
> manner prescribed by the laws of Congress.
> Opinion of the Attorney General, June 16,
> 1795 (Henry O'Reilly Papers, New York
> Historical Society, Volume 11, Folio 27).
> (Emphasis added.)

44.   On July 27, 1795, at Cayuga Ferry, New York, a
treaty was entered into between the Cayuga Nation and the State
of New York.  Among those who signed the treaty as witnesses
were Jasper Parrish and Israel Chapin.  Next to Parrish's name
on the treaty was the designation "Interpreter."  There is no
indication on the treaty in what capacity Israel Chapin signed
the treaty.

45.   On March 26, 1796, the articles of agreement
entered into on July 27, 1795, were recorded by a judge of the
New York Supreme Court.  As part of the recording process, Israel
Chapin swore to the judge that he had witnessed the signing
of the treaty by the agents for the State of New York and the
sixteen (16) Indian signatories.

46.   On July 31, 1795, Israel Chapin, Jr., wrote to Secre-
tary of War Pickering, informing him that commissioners for the
State of New York had purchased the lands of the Cayugas. Chapin
stated in his letter that he had attended the treaty signing as a

private individual and not as a commissioner representing the
United States.

47. On September 7, 1795, Israel Chapin, Jr., wrote
to Secretary Pickering that he had been visited by a party of
Cayugas from the reservation who complained that in the 1795
treaty the Western Cayugas had sold their land from under them.
They stated that Governor Clinton of New York had confirmed the
Cayuga Reservation to the Cayugas who lived on it, but that
commissioners had come forward from the state of New York and
purchased the whole reserve, except for a small piece, which was
too small for their usage. They claimed that those who had sold
their lands were Canadian Indians, not residents of the reservation.
The Cayugas told Chapin that they considered this to be a
grievance, and requested assistance in the matter from the
Secretary of War.

48. The United States did not authorize or participate
in the negotiation of the 1789, 1795 and 1807 state treaties or
the passage of the New York statutes implementing the "treaties"
and the United States has not ratified any of these "treaties"
or acts.

49. The 1795 and 1807 state "treaty" negotiations were
conducted by state officials without the consent and approbation
of the Federal Government. The "treaties" are invalid due to
the state's failure to comply with the 1790 Non-Intercourse Act,
as amended, and the attempted transfer of title to the State of
New York is void. Title remains with the Cayuga Nation. The
Federal Government has never consented to the sale or extinguish-
ment of the Cayugas' interest in such lands, and hence, the

- 22 -

Cayuga Tribe currently holds legal and equitable title to the surface and subsurface of the Original Reservation. This title is conferred by federal law, wholly independent of state law, and is protected under the Fifth and Fourteenth Amendments of the United States Constitution.

50. Defendants and each member of their class assert and claim either a possessory interest in portions of the Original Reservation lands or the right to extract or remove timber, oil, gas, coal, other minerals or any other matter of value from said lands. All of the defendants are in trespass; and the actions of some of the defendants are resulting in either waste upon the plaintiffs' lands, or conversion of plaintiffs' property. The defendants are keeping plaintiffs out of possession of their land in violation of the common law and 25 U.S.C. §177 (The Non-Intercourse Act).

WHEREFORE, plaintiffs pray that this Court:

1. Order that this action shall be maintained as a class action pursuant to Rule 23(b)(1) or Rule 23(b)(3) upon such terms as the Court deems just;

2. Declare that plaintiffs are the owners of and have the legal and equitable title and the right of possession to every portion of the subject lands which is claimed or held by any defendant or member of the defendant class;

3. Restore plaintiffs to immediate possession of all portions of the subject land claimed by any defendant or member of the defendant class and eject any defendant claiming their chain of title through the 1795 and 1807 New York State "treaties";

4.    Order an accounting of all tax funds paid by the possessors of said lands to the public and/or municipal bodies from 1795 to the present;

5.    Award plaintiffs trespass damages in the amount of the fair rental value for each portion of the subject land claimed by any defendant or member of the defendant class for the entire period of plaintiffs' dispossession but not less than $350,000,000 or $50,000 per defendant;

6.    Order that all proceeds from any sale transactions of any parcel of property within the Original Reservation from the date of filing of this action, be placed in a trust fund under the Court's jurisdiction to provide for a judgment fund from which trespass damages may be assessed;

7.    Order that all tax proceeds collected by or paid over to defendants, Seneca and Cayuga Counties, attributable to the lands within the Original Reservation Boundaries be placed in a trust fund under the Court's jurisdiction to provide for a judgment fund from which trespass damages may be assessed for the defendants;

8.    Order an accounting of any monies or other consideration received by any of the defendants in connection with the removal or extraction of any timber, oil, gas, coal, other minerals or any other matter of value from the land owned by the plaintiffs;

9.    Order that all proceeds to be derived in the future by any of the defendants in connection with the removal or extraction of any timber, oil, gas, coal, other minerals or any other matter of value be placed in a trust fund under the Court's jurisdiction, said proceeds to be distributed to the

plaintiffs upon obtaining a final judgment recognizing their ownership of the land in question;

    10.   Award plaintiffs the cost of this action and attorneys fees;

    11.   Award such other and further relief as the Court deems just.

                       Respectfully submitted,

                       JUDY LEWIS MEGGESTO
                       Meggesto & Meggesto
                       The Hamilton White House
                       Suite 100
                       One Fayette Park
                       Syracuse, New York  13202
                       (315) 471-1664

                       Attorney for Plaintiffs

Of Counsel:

Arthur J. Gajarsa
Donald W. Hamaker
Kenneth A. Marra
Wender, Murase & White
Suite 650
1120 Twentieth Street, N.W.
Washington, D. C.  20036
(202) 452-8950

Dated: Nov. 17, 1980

- 25 -



EXHIBIT A
(page 1 of 2)

WILDLIFE MGT. AREA

BOAT LAUNCHING SITE

CAYUGA
INDIAN
RESERVATION
IN
SENECA
COUNTY

(21,926 AC.)

EXHIBIT A
(page 2 of 2)



CAYUGA
INDIAN
RESERVATION
IN
CAYUGA
COUNTY

(42,089 AC.)

EXHIBIT B





EXHIBIT C
Page 1 of 3

## STATE TREATY WITH THE CAYUGAS, 1789.

At a treaty held in the City of Albany in the State of New York, by his excellency George Clinton, Esquire, Governor of the said State, the Honorable Pierre Van Cortlandt, Esquire Lieutenant Governor of the said State, Ezra L'Hommidieu, Abram Ten Broeck, John Hathorn, Samuel Jones, Peter Gansevoort Junr, and Egbert Benson, Esquires, commissioners authorized for that purpose by and on behalf of the people of the State of New York with several of the Sachems — Chiefs and Warriors of the Tribe or Nation of Indians called the Cayugas, for and on behalf of the said Nation, it is on the twenty-fifth day of February, in the year of our Lord one thousand seven hundred and eighty-nine, covenanted and concluded as follows:

First. The Cayugas do cede and grant all their lands to the People of the State of New York forever.

Secondly. The Cayugas shall of the ceded lands hold to themselves and to their posterity forever, for their own use and cultivation but not to be sold, leased or in any other manner aliened or disposed of to others, All that tract of land beginning at the Cayuga Salt Spring on the Seneca River and running thence southerly to intersect the middle of a line to be drawn from the said place of intersection westerly the general course of the eastern bank of the Cayuga Lake to this place westerly to intersect a line running on the west side of the Cayuga Lake at the mean distance of three miles from the western branch thereof, and from the said point of intersection along the said line to running on the west side of the Cayuga Lake to the Seneca River, thence down the said river to the Cayuga Lake, thence through the said Lake to the outlet thereof, thence farther down the said river to the place of beginning, so as to comprehend within the limits afore-said as I exclusive of the water of Cayuga Lake the quantity one hundred square miles; also the place in the Seneca River at or near a place called Scayes, where the Cayugas have heretofore taken eel, and a competent piece of land on the southern side of the river at the place sufficient for the said Cayugas to land and encamp on and to cure their eel, except nevertheless out the said lands or reserved one mile square at the Cayuga Ferry.

Third. The Cayugas and their posterity forever shall enjoy the free right of hunting in every part of the said ceded lands and of fishing in all the waters within the same.

Fourthly. In consideration of the said Cession and Grant, the People of the State of New York do at this present treaty pay to the Cayugas five hundred dollars in Silver (the receipt whereof the Cayugas do hereby acknowledge) and the people of the State of New York shall pay to the Cayugas on the first day of June next at Fort Schuyler, formerly called Fort Stanwix, the further sum of one thousand five hundred dollars; and further, the people of the State of New York shall annually pay to the Cayugas and their posterity forever on the first day of June in every year thereafter at Fort Schuyler aforesaid, five hundred dollars in silver. But if the Cayugas or any part of them shall at any time hereafter elect that the whole or any part of the said annual payment of five hundred dollars shall be paid in clothing or provisions and give six weeks previous notice thereof to the Governor of the said State for the time being, then so much of the annual payment shall for that time to in clothing or provisions as the Cayugas or their posterity shall elect, and at the price which the same shall cost the people of the State of New York at Fort Schuyler aforesaid; and as a further consideration to the Cayugas the people of the State of New York shall grant to their adopted child Peter Ryckman, whom they have expressed a desire should reside near them to assist them, and as a benevolence from them the Cayugas to him, and in return for services rendered by him to their Nation, the said tract of one mile square at the Cayuga Ferry, excepted out of the said lands reserved to the Cayugas for their own use and cultivation. That of a tract beginning on the west bank of the Seneca Lake, thence running due west (passing one chain north of an house lately erected and now in the occupation of the said Peter Ryckman) to the line of partition between this State of New York and the Commonwealth of Massachusetts of the lands ceded to each other, thence due south along the said line of partition, thence due east to the Seneca Lake, thence northerly along the bank of the said lake to the place of beginning, so as to contain sixteen thousand acres. The people of the State of New York shall grant three hundred and twenty acres to a white person, married to a daughter of a Cayuga named Thanowaas, including the present settlement of the said person on the south of Ontwah Creek, and that the people of the State of New York shall grant the residue of the said tract of sixteen thousand acres to the said Peter Ryckman.

Fifthly. The people of the State of New York may at all times hereafter in such manner and by such means as they shall deem proper prevent any persons except the Cayugas and their adopted

[Assembly, No. 51.]   28



EXHIBIT C
Page 2 of

brethren the Tuscarora from residing or settling on the lands to be held by the Cayugas and their posterity for their own use and cultivation, and if any persons shall without the consent of the people of the State of New York come to reside or settle on the said lands or any other of the lands so ceded as aforesaid, the Cayugas and their posterity shall forthwith give notice of such intrusion to the Governor of the said State for the time being.  And further the Cayugas and their posterity forever shall at the request of the Governor of the said State be willing to the people of the State of New York in removing all such intruders and apprehending not only such intruders, but also all felons and other offenders who may harbour to be on the said ceded lands, to the end that such intruders, felons and other offenders may be brought to justice.  Notwithstanding the said reservation herein above specified, to the Cayugas, it is declared to be the intent of the parties that the Cayuga called the Fish Carrier, shall have a mile square of the said reserved lands for the separate use of himself and for the separate use of his family forever.

In testimony whereof as well the Sachem, Chiefs, Warriors, Governesses and others of the Cayugas in behalf of their tribe or Nation as the said Governor and other Commissioners in behalf of the people of the State of New York have hereunto interchangeably set their hands and affixed their seals the day and year first above written.

PIERE VAN CORTLANDT,
EZRA L'HOMEDIEU,
ABM. TEN BROECK,
JOHN HATHORN,
SAMUEL JONES,
PETER GANSVOORT, JUNR.
EGBT. BENSON.
JOGHIGNEY
AGOTTONGOS
HAONGHSENTHA
TOWAKAMETHA
YOWEANSE
KANIOHSATENDE

KAWFENESSON
SWATTLEA
KAGHENNTO
KAJO, OSKUREAGH
KANOGGHSIIYATHA
TEYOWEANDAGAYONGH

N. B. The above four signed by their Chief Steel Trap.

TEWETHCHASE
AHAGUENDYAK
TYOTEENEXENTHA
TEYGAWAKHONGH

N. B. The above four persons signed by Steel Trap as their deputy.

THANKIGHTYAGON
TEKENEAGHAGE
HANANJAC
GOOHGE
KOWAYADOWAYADOWEAGHSILA
THAHONGHLTE
ATTYOANEAUNI
JADENON
NEGGOONDE
KANISTAGIA (his mark a steel trap)
GEO. CLINTON.

Sealed and delivered in the presence of — The words (quantity of) (in the Seneca River at or near a place) (thereafter) (the) and (e) being first interlined, and the words (of a) and (fifth), the people of the State of New York may at all times hereafter in such manner and by such means as they may deem proper any person) being first wrote on Erazures.—Before sealing and delivery hereof, it was for the greater certainty declared to be the intent of the parties that this grant and cession is only of the lands eastward of the partition line above mentioned between this State of New York and the

EXHIBIT C
Page 3 of 3

Covenants with the Oneidas, &c, that with respect to said part
of their said tract the residue of the said pacification line the rights and
liberties of the parties to be the same as if this grant and reservation
had been in [...] sold. Captain Salt Spring and the land to
[...] as aforesaid, the same to remain for the common
[...] reserved the State of New York, and of it
[...] part is [...] forever. And the land to be reserved
[...] for [...] be, [...], to the extent of one mile
[...] above, reservation of land on the
[...] is but only notwithstanding

SAM: KIRKLAND,

*Ma'y*

JOHN I. PFEIFFER,
GREEN BANCKER,
OSNO [...]
KARIOTOO [...]
PETER AG WHOSTONG WAS,
SERANONOGH,
BAGHLENDE,
WY A DE AGH KALONGWEA *alias* LEWIS COOK,
AGHNAGHSALITE *alias* DANIEL,
GILBERT LIVINGSTON,
JOHN TAYLER,
PHILIP CORTLANDT.



EXHIBIT D
Page 1 of

I having Examined the same and found no alteration therein other than those noted to have been erazures in the Execution thereof

The preceding Instrument is a true Copy of the Original Examined and Compared therewith this 4th day of April 1793 By me

ROBT HARPUR

D. Secy

At a Treaty held at the Cayuga Ferry in the State of New York by Philip Schuyler, John Cantine, David Brooks and John Richardson Agents authorized for that purpose by and on behalf of the People of the State of New York with the tribe or nation of Indians called the Cayugas, it is on this treaty seventh day of July one thousand seven hundred and ninety five covenanted concluded and agreed upon as follows,

Whereas there was reserved to the Cayuga Nation by the articles of agreement made at Albany on the twenty fifth day of February one thousand seven hundred and eighty eight and confirmed by subsequent articles made at Fort Stanwix on the twenty second day of June one thousand seven hundred and ninety sundry lands in the said Articles particularly specified and described

Now Know all Men that in order to render the said reservations more productive of annual income to the said Cayuga nation, (it is Covenanted, stipulated and agreed by the said Cayuga Nation that they will sell and they do by these presents sell to the People of the State of New York all and singular the Lands reserved to the use of the said Cayuga Nation) in and by the hereinbefore mentioned articles of Agreement that is to say as well the Lands bordering on and adjacent to the Cayuga Lake Commonly called the Cayuga reservation as the Lands at Scawyace and elsewhere heretofore or now appertaining to the said Nation (except the Lands hereinafter particularly excepted and still to be reserved to the said Nation or the Individual Sachem Fish Carrier) to here and to hold the same to the People of the State of New York and to their Successors forever.—

Secondly it is Covenanted and agreed by and on the part of the People of the State of New York that for the Lands now sold as aforesaid in the preceding first Article the State of New York shall pay and do now pay to the said Cayuga Nation in presence of the witnesses who have Subscribed their names hereunto the sum of Eighteen hundred Dollars and do further promise and engage to pay to the said Cayuga Nation in manner hereinafter specified the further sum of Eighteen hundred Dollars on the first day of June next ensu-

ing the date hereof and annually forever thereafter on the first day of June in each year the sum of Eighteen hundred Dollars

Thirdly that as well the said Eighteen hundred Dollars to be paid as mentioned in the Secot. Article as the first Eighteen hundred Dollars to which the said Cayuga Nation are annually entitled by virtue of the Treaty and articles of agreement first above mentioned shall in future be annually paid on the first day of June in each year forever hereafter at Canandaigua in the County of Ontario to the Agent for Indian affairs under the United States for the time being residing within this State and in case no such Agent shall be appointed on the part of the United States then by such person as the Governor of the State of New York shall thereunto appoint to be by the said Agent or person so to be appointed paid to the said Cayuga Nation taking their receipt therefor on the back of the Counterpart of this instrument in the possession of the said Indians in the words following to wit "We the Cayuga Nation do acknowledge to have received from the People of the State of New York the sum of two thousand and three hundred Dollars in full for the several Annuities which mentioned in this day of 179 " which money shall be paid in the presence of at least one of the Magistrates of the County of Ontario and in the presence of at least two more reputable Inhabitants of the said County and which Magistrate and other persons in whose presence the same shall be paid shall subscribe their names as witnesses to the said Receipt and the said Agent or other person so to be appointed shall also take a duplicate receipt for the said Money witnessed by the said Witnesses and which duplicate shall as soon as Conveniently may be acknowledged and recorded in the records of the said County of Ontario and the Original duplicate transmitted to the Governor of this State for the time being—

Fourthly the People of the State of New York reserve to the Cayuga Nation and to their posterity forever for their own use and Occupation but not to be Sold letely leased or in any other manner alloned or disposed of to others unless by the express Consent of the Legislature of the said State a Certain Tract of Land part of the reservation aforesaid of two miles square at such place as the same shall be run out and marked by a Surveyor appointed by the said State that part of the People of this State together with such of the said Indians as shall attend for that purpose and also one other piece of land of one mile square part of the reservation aforesaid until the Mine within the same if any there be under the same restrictions and to be run out and marked in manner aforesaid, and also one other piece of

29

[Assembly, No. 61.]



EXHIBIT D
Page 2 of

Lands one mile square at Cayuga for the use of an Indian Sachem of the said Nation called Fish Carrier and for the use of his posterity forever under the restrictions aforesaid which said last piece of land shall be leased by the People of the State of New York for such term and on such Conditions as the Legislature thereof shall direct and the money annually arising therefrom shall be paid unto the said Fish Carrier or his posterity. It being found by the said Agent or by such persons as the Governor of this State shall thereunto appoint and unto such person as shall produce a Certain Writing Subscribed by the said Agents and Sealed with their Seals taking and recording the receipts therefor in the manner aforesaid—

Fifthly, the People of the State of New York may in such manner as they shall deem proper prevent any persons except the Cayugas from residing or settling on the Lands so to be held by the Cayugas and their posterity for their own use and Cultivation and if any person shall without the Consent of the People of the State of New York come to reside or settle on the said Lands or any other of the Lands so reserved as aforesaid the Cayugas and their posterity shall forthwith give notice of such intrusion to the Governor of the said State for the time being   And further the Cayugas and their posterity forever shall at the request of the Governor of the said State be aiding to the People of the State of New York in removing all such intruders and in apprehending not only such intruders but also Felons and other offenders who may happen to be on the said reserved Lands to the end that such intruders, felons and other offenders may be brought to Justice

In Testimony whereof as well the Sachems, Chief Warriors and others of the said Cayuga in behalf of their tribe or Nation as the said Agents on behalf of the People of the State of New York have hereunto interchangeably set their hands and affixed their Seals the day and year first above written.

PH: SCHUYLER                    [L. S.]

JOHN CANTINE                    [L. S.]

D BROOKS                        [L. S.]

JOHN RICHARDSON                 [L. S.]

OIAGEGHTI on FISH CARRIER ᴴⁱˢ ✕ ᵐᵃʳᵏ   [L. S.]


DSIKONTWENHON ᴴⁱˢ ✕ ᵐᵃʳᵏ        [L. S.]

TEKAHOS on THAWENAGENHAT ᴴⁱˢ ✕ ᵐᵃʳᵏ  [L. S.]

SAGOYEGHWATHA ᴴⁱˢ ✕ ᵐᵃʳᵏ        [L. S.]

OGONGHSANIONDE on HANGING FACE ᴴⁱˢ ✕ ᵐᵃʳᵏ  [L. S.]

ONGWEGHKOWA ᴴⁱˢ ✕ ᵐᵃʳᵏ          [L. S.]

THYEYA GEARAT ᴴⁱˢ ✕ ᵐᵃʳᵏ        [L. S.]

KAYENTARIRHON ᴴⁱˢ ✕ ᵐᵃʳᵏ        [L. S.]

THONONGHRIONGO ᴴⁱˢ ✕ ᵐᵃʳᵏ       [L. S.]

SAGOYATENGHKAWE ᴴⁱˢ ✕ ᵐᵃʳᵏ      [L. S.]

SHAGHNEGHTATI ᴴⁱˢ ✕ ᵐᵃʳᵏ        [L. S.]

SHONEGISSOWANE ᴴⁱˢ ✕ ᵐᵃʳᵏ       [L. S.]

SHATEENGHHARIA ᴴⁱˢ ✕ ᵐᵃʳᵏ       [L. S.]

KANEATAGONRA ᴴⁱˢ ✕ ᵐᵃʳᵏ         [L. S.]

ADIANATE ᴴⁱˢ ✕ ᵐᵃʳᵏ             [L. S.]

KANAGHTOOGEA ᴴⁱˢ ✕ ᵐᵃʳᵏ         [L. S.]

Delivered in the presence of the word
(thereunto) being first interlined
between the sixteenth and seven-
teenth lines and the words (at least)
between the nineteenth and twentieth
lines and the words (part of the
reservation aforesaid and the same
within the same if any there be under
the same restrictions and to be run
out and marked in manner aforesaid
and also one other piece of Land of
one mile square) between the twenty
sixth and twenty seventh lines

ISRAEL CHAPIN
JAMES DEAN
    Interpreter,
JASPER PARRISH
    Interpreter,
HENRY AARON HILL,
AARON HILL JU'R
BEN: LEDYARD,
JOHN HARRIS,
WILLIAM WESTON,
JNO. B. SCHUYLER,
RENSSELAER WESTERLO,

STATE OF NEW YORK ss:

To all People to whom these presents shall come Greeting ; Know Ye that on the twenty seventh day of July in the year One thousand seven hundred and Ninety five The People of the State of New York did reserve to the Cayuga Nation of Indians and to their own use and occupation but not to be sold leased or in any other manner aliened or disposed of to others unless by the express consent of the Legislature of the said State a certain Tract of Land part of the reservation there fore reserved to them of Two Miles Square at such place as the same shall be run out and marked by a Surveyor appointed by agents on the part of the people of this State together with such of the said Indians as shall attend for that purpose. And also one other piece of land of one mile square part of the reservation aforesaid and the mine within the same if any there be under the same restrictions and to be run out and marked in manner aforesaid. And

Whereas The said two tracts of land have been laid out and surveyed in manner aforesaid and occupied by the said Cayuga Nation. And

Whereas The said Cayuga Nation of Indians have signified their desire to remove from the said lands and to dispose of their Interest therein to the people of this State for the sum of four thousand eight hundred dollars which sum the Legislature have agreed to pay the said Cayuga Nation for their interest in the said two Reservations of Land.

Now know ye that the said Cayuga Nation for and in consideration of the sum of Four thousand eight hundred dollars to them in hand by the People of the State of New York at Canandarqua have sold and released and by these presents Do sell and release to the people of the State aforesaid all their right title Interest possession property claim and demand whatsoever of in and to the said two tracts of Land laid out and Surveyed as aforesaid on the east side of Cayuga Lake commonly called the Cayuga Reservations the said tract being two miles square and the other Tract being One mile square — which two reservations contain all the land the said Cayuga Nation claim or have any interest in in this State To have and to hold the said Two tracts of Land as above described unto the People of the State of New York and their Successors forever.

In Witness whereof the Chief Sachems and Warriors of the said Cayuga Nation have hereunto set their hands and Seals this thirtieth day of May in the year of our Lord One thousand eight hundred and Seven

TA-KI-HA-YO   [L s.]

CHE-NON-DA-YO   [L s.]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

```
_____
                               )
THE CAYUGA INDIAN NATION OF NEW YORK,)
AND FRANKLIN PATTERSON, JAMES LEAFFE,)
VERNON ISAAC, KENNETH JOHN AND FRANK )
BONAMIE                              )
                                     )
                    Plaintiffs,      )
                                     )
           v.                        )    Civil Action No.
                                     )
HUGH L. CAREY, as Governor of the    )
State of New York, et al.            )
                                     )
                    Defendants.      )
                                     )
_____     )
```

## MOTION TO CERTIFY DEFENDANT CLASS

Plaintiffs in the above-captioned action, through their undersigned counsel, move this Court for an Order that, for purposes of determining liability of defendants, the above-captioned action be maintained as a defendant class action under Rule 23(c)(1) of the Federal Rules of Civil Procedure, with the named defendants representing all persons claiming any part of the subject land of approximately sixty-four thousand (64,000) acres, see Exhibit A attached to the Complaint.

Respectfully submitted,

JUDY LEWIS MEGGESTO
Meggesto & Meggesto
The Hamilton White House
Suite 100
One Fayette Park
Syracuse, New York  13202
(315) 471-1664

Attorney for Plaintiffs

Of Counsel:

Arthur J. Gajarsa
Donald W. Hamaker
Kenneth A. Marra
Wender, Murase & White
Suite 650
1120 - 20th Street, N.W.
Washington, D. C. 20036
(202) 452-8950

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

———————————————————————
THE CAYUGA INDIAN NATION OF NEW YORK,  )
                                )
             Plaintiffs,  )
                                )
          v.              )  Civil Action No.
HUGH L. CAREY, as Governor of the   )
State of New York, et al.         )
                                )
             Defendants.  )
———————————————————————

MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION

Plaintiffs have filed a complaint seeking a declaration of their current ownership of and right to possess approximately sixty-four thousand (64,000) acres of land in central New York State and their right to trespass damages and other forms of monetary relief.  Plaintiffs' possessory claim is based on illegal transfers of the Cayuga's reserved lands.  Plaintiffs' title to the subject lands is protected by treaties negotiated between the United States and the Cayuga Nation, federal statutory law, and federal common law.  Possession of the subject land was lost by plaintiffs through transactions with the State of New York in 1795 and 1807.  The basic thrust of plaintiffs' lawsuit is that the transactions were void.

The present occupants of the subject land all trace title through mesne conveyances to the 1795 and 1807 trans-actions which are challenged in this lawsuit.  The occupants

in possession of the lands within the boundaries of the land
outlined in Exhibit A, are sued by plaintiffs as a defendant
class.  For identification purposes, eighty-two named defendants
are sued individually and as representatives of the approximately
7,000 members of the defendant class.  Plaintiffs move this
Court to certify the defendant class for purposes of determining
the liability issues. 1/  The action satisfies the requisites
of Federal Rule of Civil Procedure 23(b)(3) and plaintiffs ask
the Court to certify the defendant class.  Certification of
the defendant class will facilitate conduct of the litigation
for the defendants and the Court, as well as for plaintiffs,
and thus the action should be certified in the interests of
justice and of judicial economy.

_____

1/ If plaintiffs prevail on the liability issues, plaintiffs
will proceed separately against each member of the defendant
class to determine the amount of trespass damages and other
relief.

- 2 -

I.   THIS ACTION SATISFIES THE CRITERIA OF F.R.C.P. 23(a)

To be certified as a defendant class action, this case must meet each of the prerequisites of Rule 23(a), and fall within one of the subdivisions of Rule 23(b).  State of West Virginia v. Charles Pfizer & Co., 440 F.2d 1079, 1089 (2nd Cir. 1970), cert. denied, 404 U.S. 871 (1971).  7 C. Wright and A. Miller, Federal Practice and Procedure, §1759 (1972) (hereinafter cited as Wright and Miller).  These requirements apply equally to plaintiff and defendant classes.  Marcera v. Chinlund, 595 F.2d 1231 (2nd Cir. 1979), judgment vacated on other grounds, 99 S.Ct. 2833, June 4, 1979.  Subsection (a) has four requirements that the party moving for class certification must demonstrate -- numerosity, commonality, typicality and adequacy of representation. 2/  This action is a paradigm of all four factors.

A.  Numerosity

Numerosity, used in reference to class actions, is shorthand for the requirement of Rule 23(a) that "the class [be] so numerous that joinder of all members is impracticable."

---

2/  The courts have also held that the moving party must demon-strate that the class actually exists.  Oneida Indian Nation of Wisconsin v. State of New York, 85 F.R.D. 701, 704 (N.D.N.Y. 1980); Dolgow v. Anderson, 43 F.R.D. 472, 491 (E.D.N.Y. 1968), rev'd on other grounds, 438 F.2d 825 (2nd Cir. 1971). The existence of this class can readily be determined from a review of the public records concerning the land involved. Oneida Indian Nation, supra.

- 3 -

Professor Moore has noted that "while there are exceptions, numbers in excess of forty, particularly those exceeding one hundred or one thousand, have sustained the requirement" of numerosity.  3B Moore, §23.05, p. 23-154-155 (footnotes omitted); see also, Lewis v. Bogim, 337 F. Supp. 331, 339 (S.D.N.Y. 1972), where the court held that a 1103 member class was "clearly so large as to render the joinder of members impracticable within the meaning of Rule 23(a)"; and Green v. Wolf Corp., 406 F.2d 291, 298 (2nd Cir. 1968), where the Court held that 2,000 class members easily met the numerosity requirement.  In addition, the class must be sufficiently defined so that the Court can ascertain whether a particular individual is a member of the class at any time.  Robertson v. National Basketball Ass'n., 389 F. Supp. 867 (S.D.N.Y. 1975), aff'd, 556 F.2d 602. 3/

          In the present action, the proposed defendant class numbers approximately 7,000 members.  See Affidavit of Donald W. Hamaker attached.  The proposed class easily satisfies the requirement of numerosity.  Moreover, whether a particular individual is included in the class can be readily ascertained by reference to the map outlining the subject area (attached as Exhibit A to the Complaint) and records maintained by the counties' tax assessor offices.  Oneida Indian Nation, supra, at 704, 705.  Thus, the proposed defendant class is sufficiently

_____

3/  That the members of the class must be ascertainable, however, does not require the party moving to certify the class to specify precisely the number of persons in the proposed class. Robertson at 897.

- 4 -

large and discrete to justify certification. 4/

        B.  Commonality

        The commonality prerequisite of Rule 23(a) requires
a Court to inquire whether "there are questions of law or
fact common to the class."  The liability issues (which are
the only ones plaintiffs seek class certification to adjudicate)
are very nearly identical as to each member of the proposed
class.  The liability issues in this case generally fall into
three groups:  first, plaintiffs' proof relating to its current
right to use and occupy the Original Reservation pursuant to
the 1789 Treaty; second, the construction placed on the federal
treaties and laws; and third, the construction placed on the
1795 and 1807 transactions between the Cayuga Indian Nation
and New York State.  The first and second sets of issues are
common to all members of the defendant class.  As to these issues,
the interest of the class and its respective members are identi-
cal, that is, to defeat plaintiffs' allegations.  As to the
third set of liability issues, the issues of fact and law are
somewhat different for the two state transactions challenged by
plaintiffs.  Members of the defendant class who trace title back
to the 1795 and 1807 transactions have an interest in defending
against each of those claims.  In short, the issues are pre-
dominantly common to all members of the class.  Since Rule 23(a)
does not require that all issues raised by the complaint be
common, the predominance of common issues is more than sufficient.
See, Wright and Miller, §1763, Like v. Carter, 448 F.2d 798,
802 (8th Cir. 1970).

---

4/ Primarily because of the geographic limitation on the proposed
defendant class, this situation is unlike that faced by the Court
in Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, vacated at 417
U.S. 156 (1974) known as Eisen III.

C.  Typicality

The third requirement of Rule 23(a) is typicality,
i.e., "the claims of defense of the representative parties are
typical of the claims or defenses of the class."  To meet this
requirement, the moving party must show that the representatives
of the class are not exceptions to the general patterns of fact
and law shared by the class.  7 Wright and Miller, §1764.  Most
frequently, the requirement has been interpreted to mean only
that the representatives' interest must not be antagonistic to
those of the class.  See, e.g., Cutner v. Fried, 373 F. Supp.
4, 13 (S.D.N.Y. 1974); American Finance Systems, Inc. v. Harlan,
65 F.R.D. 94, 198 (D.Md. 1974); Cannon v. Texas Gulf Sulfur Co.,
47 F.R.D. 60, 63 (S.D.N.Y. 1969).  The Second Circuit has found
"typicality" where it determined that all members of the class
would benefit if the class were successful in the litigation.
Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562 (2nd Cir. 1968),
known as Eisen II.

The representatives of the defendant class named by
plaintiffs here include the administrators of all state depart-
ments or agencies that claim an interest in the subject land,
all counties in the claim area, municipal corporations located
throughout the claim area and a few private claimants (corporate
and individual) throughout the claim area.  As noted above,
these representatives' interest in the liability issues is
identical to that of the class members, i.e., defeating plaintiffs'
proof of title and construction of the federal treaties and state
transactions.  With one exception 5/ the defenses of the

---

5/ The New York State administrators may claim the Eleventh Amend-
ment as a bar to plaintiffs' claims.  That defense, if asserted,
is unique to the State officials.  In Oneida Indian Nation, supra,
the court rejected the State of New York's contention that the
availability of this possible defense only to it prevented the
criterion of typical defenses from being met.  Id., at 705.

- 6 -

representative parties are neither exceptional nor antagonistic with respect to other class members.  The representative defendants claim land in every county included in the subject land and in every condition represented in the defendant class. They can thus be relied on to litigate any defense based on status, location, or use. 6/  In every respect, the claims of the representatives are typical of those of the respective class members.  Oneida Indian Nation, supra, at 705.

     D.   Adequacy of Representation

     The fourth and final requirement of Rule 23(a) is adequacy of representation, i.e., a showing that "the representative parties will fairly and adequately protect the interests of the class."  In the Second Circuit, adequacy of representation is deemed virtually identical of the requirement of typicality discussed above.  See, Marcera v. Chinlund, 595 F.2d at 1239; Eisen v. Carlisle & Jacquelin, 391 F.2d at 562-63; Robertson v. National Basketball Ass'n., 389 F. Supp. at 898, aff'd at 556 F.2d 682 (2nd Cir. 1977).  Thus, because of the identity of interest of the class members (discussed above), the named representatives will adequately defend the class by defending themselves.

---

6/ If any class member has an affirmative defense presently unknown to plaintiffs which requires proof specific to that defendant, the appropriate procedure is to dispose of the common issues and order the separate trial of such individual defenses.  Marcera v. Chinlund, 595 F.2d at 1239; Green v. Wolf Corp., 406 F.2d 291, 299 (2nd Cir. 1968), cert. denied, 395 U.S. 977 (1968); Fogel v. Wolfgang, 47 F.R.D. 213, 217 (S.D.N.Y. 1969); Dolgan v. Lenderson, 43 F.R.D. 472, 490-491 (E.D.N.Y. 1968); 7 Wright and Miller, §1764, p. 614.

- 7 -

Marcera v. Chinlund, 595 F.2d at 1239. 7/  Moreover, the repre-
sentatives' practical ability to adequately represent the class
cannot be doubted.  The representatives include the state admini-
strative officials, counties and the larger corporate and non-
corporate private claimants.  The representatives, therefore,
have the greatest stake in the outcome of the controversy as well
as the most resources to finance the litigation.  In Oneida Indian
Nation, supra, a case almost identical to that presented here,
the court stated:  "The proposed representatives all have property
interests to protect in this action, and there is absolutely no
indication that they have any intention but to vigorously defend
those interests against the plaintiffs' claims.  Therefore, the
Court is assured that the class members will receive adequate
protection."  Id. at 706.  The Court's statement is equally
applicable to the present case.  See Technograph Printed Circuits,
Ltd. v. Methode Electronics, 285 F. Supp. 714, 721 (N.D.Ill. 1968).

7/ In the context of defendant class actions, the Second Circuit
also noted in Marcera that named representatives need not be
willing representatives to be deemed adequate representatives:

> "...courts must not readily accede to
> the wishes of named defendants in this
> area, for to permit them to abdicate so
> easily would utterly vitiate the effec-
> tiveness of the defendant class action
> as an instrument for correcting widespread
> illegality.  Rule 23(a)(4) does not re-
> quire a willing representative but merely
> an adequate one."

- 8 -

In sum, the proposed defendant class qualifies easily for certification under Rule 23(a). The class members, numbering 7,000 cannot easily be joined and yet the legal and factual issues as between each of the class members and plaintiffs are identical. Because nearly all issues are common to each respective class member, the defenses of the representatives are typical of the class and those representatives can adequately protect those interests.

> II.   THIS ACTION CAN BE CERTIFIED PURSUANT TO
>        F.R.C.P. 23(b)(1)(B) or F.R.C.P. 23(b)(3)

As noted above, proposed class actions must not only satisfy the criteria of F.R.C.P. 23(a), but must also fit within one of the subdivisions of Rule 23(b). The present action can be most appropriately certified under Rule 23(b)(1)(B), which requires that:

> the prosecution of separate actions by
> or against individual members of the
> class would create a risk of adjudica-
> tions with respect to individual members
> of the class which would as a practical
> matter be dispositive of the interests
> of the other members not parties to the
> adjudications or substantially impair
> and impede their ability to protect
> their interests.

Generally, subdivision (b)(1)(B) allows class treatment where prosecution of one section could impair the rights of members of the potential class as a practical matter. 7 Wright and Miller, §1774. Professor Benjamin Kaplan, the Reporter to the Advisory Committee when Rule 23 was revised in 1966, summarized the Committee's concern in adopting Rule 23(b)(1)(B):

- 9 -

"In new subdivision (b)(1)(B), the
Committee took up a vantage point
within the class, and spied out situ-
ations where lawsuits conducted with
individual members of the class would
have the practical if not technical
effect of concluding the interests of
the other members as well, or of im-
pairing the ability of the others to
protect their own interests."  Kaplan,
Continuing Work of the Civil Committee;
1966 Amendments of the F.R.C.P. (I),
81 Harv.L.Rev. 356, 388 (1967).

The focus of 23(b)(1)(B) on practical effects of
separate lawsuits is reflected in Technograph Printed Circuits,
Ltd. v. Methode Electronics, supra, where a 23(b)(1)(B) class
was certified.

In Technograph Printed Circuits, a would-be plaintiff
class sued four defendants for alleged patent infringement.  The
district court certified the class under 23(b)(1)(B) based on
the following practical effects of separate lawsuits:

"Selected adjudications of the questions
of invalidity, misuse and fraud of the
United States Patent Office may be accorded
great weight in industrial relations by
comity between courts and may greatly
impair and impede the ability of members
of the class and any subclasses thereof
who are not parties to this action to
protect their interests.  To the extent
that such selected adjudications vary or
are inconsistent the ability of those who
are not parties to this action will be
further impaired or impeded.

The disruption of identical relations of
the members of the class by threats and
claims based upon patent grants, and also
upon the possibility of a final, favorable
adjudication to plaintiffs in some competent
court, as well as the great expense of
defending these and other separate actions
to the point of adjudication would sub-
stantially impair or impede the ability

- 10 -

of members of the class to protect their
interests."  Technograph Circuits, Ltd.,
285 F. Supp. at 723.

Accord, Robertson v. National Basketball Ass'n., supra.

The practical effects of separate adjudications relied
on by the courts in Technograph Printed Circuits and Robertson
are indirect and speculative in comparison to the effect of
separate adjudications here.  Each member of the proposed defen-
dant class here traces title to one of the two state transactions
challenged by plaintiffs in this action.  Should plaintiffs pre-
vail in this case against the named representatives only, a
cloud on the title of every other potential class member would
result.  A ruling in plaintiffs' favor would thus substantially
impair the absent class members' full use and enjoyment of their
real property even if no separate actions were instituted against
the absent members of the proposed class.  This precise reasoning
was adopted by the Court in Oneida Indian Nation, supra.  As
previously indicated, the issue presented in Oneida and the bases
for the cause of action are almost identical to the issues and
facts presented here.  In determining that a defendant class
could be maintained under Rule 23(b)(1)(B), the court stated:

> "The fact that a determination on the
> liability issues might have stare decisis
> consequences for individuals owning pro-
> perty in the claimed area would not be
> sufficient to bring the action within
> Section (b)(1)(B)....However, in this
> instance, adjudication favorable to the
> plaintiffs against the individual defen-
> dants on the liability issue would have
> a far greater impact than simply stare
> decisis consequences.
>
> Defendants contend that the commencement
> of this action has placed a cloud on the

- 11 -

> titles of all property in the affected
> area, whether the owner is a party to
> this action or not.  A determination on
> liability in plaintiffs' favor could,
> according to defendants virtually destroy
> the value and marketability of all of the
> property in the area.  Thus, it is clear
> that this is the type of situation en-
> visioned under Section (b)(1)(B) for
> class action treatment."

These serious and inevitable consequences are precisely the sort Rule (b)(1)(B) seeks to avoid and under Technograph Printed Circuits and Robertson, above, justify certification of the class.

These considerations lead ineluctable to the conclusion that the proposed defendant class should be certified pursuant to Rule 23(b)(1)(B).  In addition, this class also qualifies for certification pursuant to Rule 23(b)(1)(B). 8/ As discussed above, common questions of law or fact predominate and class treatment will make conduct of the litigation more efficient for the parties and the court while protecting the interests of the unnamed class members.  Those factors support certification pursuant to Rule 23(b)(3).  However, where an action can be maintained under either Rule 23(b)(1) or Rule 23(b)(3), the action should be certified under Rule 23(b)(1) so that the policy of promoting economy and finality is not undermined. Robertson v. National Basketball Ass'n., 556 F.2d at 685; and cases cited therein.  Therefore, plaintiffs request the court to certify the class pursuant to Rule 23(b)(1)(B).

---

8/ Subsection (b)(3) states that:

> "the court find[s] that the question
> of law or fact common to member of the
> class predominate over any questions
> affecting only individual members, and
> that a class action is superior to other
> available methods for the fair and effi-
> cient adjudications of the controversy."

- 12 -

### III.   THE PROPOSED DEFENDANT CLASS IS MANAGEABLE.

Because plaintiffs filed their motion to certify the class and the complaint simultaneously, plaintiffs are not sufficiently familiar with the position of the named representative to propose an Order of certification.  Plaintiffs submit the following suggestions for the court's consideration.

1.   An Order of certification should be issued with the class consisting of those defendants who trace title to the 1795 and 1807 state transactions.  Designation of the class would likely result in total identity of issues and interests among the class members.

2.   Legal counsel could be designated for the class with the state, municipal corporations, private corporations, and private non-corporate persons each being represented by a lead counsel.  Such a designation would simplify conduct of the litigation for the court and parties.

3.   Requirements of notice to the class members should be specified.  The court could indicate the facts such notice must contain, e.g., the location of claim, nature of claim, relief sought by plaintiffs, name and address of representative defendant and their counsel, etc.  The notices could be published in every major state paper and local papers in the claim area, and notices could be mailed to each property owner listed in each county tax assessor's office in the claim area.  Copies of the Complaint and Exhibits could be placed in county and municipal buildings for public inspection.

IV.   CONCLUSION

As this memorandum has demonstrated, the appropriateness
of defendant class action certification is manifest.  Beyond
the requirements of Rule 23, however, fairness to the parties
requires class certification.  Unless the defendant class is
certified, the plaintiffs will face the overwhelming task of
naming 7,000 individual defendants.  If the class is certified,
plaintiffs' claims can be fully litigated with the burden of
conducting and financing the litigation falling on those
defendants most able to bear it.  Class action treatment is
superior, indeed, the only feasible mechanism for managing this
type of litigation.

Based upon all of the foregoing, the plaintiffs request
that its motion for certification of a defendant class be granted.

                                Respectfully submitted,


                                JUDY LEWIS MEGGESTO
                                Meggesto & Meggesto
                                The Hamilton White House
                                Suite 100
                                One Fayette Park
                                Syracuse, New York  13202
                                (315) 471-1664

                                Attorney for Plaintiffs


Of Counsel:


Arthur J. Gajarsa
Donald W. Hamaker
Kenneth A. Marra
Wender, Murase & White
Suite 650
1120 Twentieth Street, N.W.
Washington, D. C.  20036
(202) 452-8950


                           - 14 -

## AFFIDAVIT OF DONALD W. HAMAKER

I am employed as an Associate with Wender, Murase & White, located at Suite 650, 1120 Twentieth Street, N.W., Washington, D.C. 20036.  The law firm is under an agreement with the Cayuga Indian Nation of New York to assert their legal rights to 64,015 acres of land occupying their Original Reservation area.  I was primarily responsible for the title search required by that agreement.

I received my B.S. degree from Northwestern University in May of 1974.  I graduated from Georgetown University Law Center in May of 1977.  In the course of my work, I directed a title search of all land in the two (2) counties, Seneca and Cayuga, which constitutes the Cayuga Tribe's Original Reservation land claim area.

The basic data resource used to estimate population in the claim area were record title reports located in the Counties of Seneca and Cayuga.  Under my supervision, the land title records were searched in Waterloo, New York and Auburn, New York.

Based on the land title records, I know that the number of persons affected directly by the Cayuga land claim concerning the 64,015 acres of land of their Original Reservation in Seneca and Cayuga Counties is approximately 7,000.

DONALD W. HAMAKER

Sworn to before me this 29

day of October , 1980.

NOTARY PUBLIC

My Commission expires: October 14, 1983.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

THE CAYUGA INDIAN NATION OF NEW YORK, et al. )
                                   )
                  Plaintiffs,    )
                                   )
            v.                      )
                                   )
HUGH L. CAREY, as Governor of the      )
State of New York, et al.             )
                                   )
                 Defendants.    )
                                   )

---

## PLAINTIFFS' FIRST SET OF INTERROGATORIES
## TO DEFENDANT

     Plaintiffs' by their counsel, request that Defendant answer separately and fully in writing, under oath, within forty-five (45) days, of the following Interrogatories:

### INSTRUCTIONS

     In answering these Interrogatories, you must furnish all information that is known or available to you irrespective of whether this information is possessed directly by you, or by your agents, partners, employees, representatives, or, unless privileged, by your attorneys or their agents.

     If any of these Interrogatories cannot be fully answered, you must answer them to the fullest extent possible, specifying the reasons for your inability to answer the remainder and stating whatever information, knowledge or belief you have concerning the unanswered portion.

     These Interrogatories are continuing in nature and if any information sought is presently unavailable to you, it must be provided when it becomes known.

Whenever a request is made to identify any writing or writings, each such document shall be separately identified by stating as to each:

      (a)   The date;

      (b)   The author;

      (c)   The title of the writing or other identifying designation;

      (d)   The subject matter and content;

      (e)   The name and address of the present custodian of the writing.

Whenever a request is made to identify a person or persons each such individual shall be identified by stating his/her:

      (a)   Name in full;

      (b)   Business address;

      (c)   Residence address;

      (d)   Present title, occupation, and employer.

## INTERROGATORIES

1.   Please separately identify each parcel of real estate possessed or owned, in whole or in part, by you which is located within the land area encompassed by this action, as set forth in Appendix A to the Complaint. As to each such parcel, list the following information separately:

      (a)   Date of purchase;

      (b)   Legal description;

      (c)   Co-owners, if any; and

      (d)   Purchase price of parcel;

(e)   Assessed valuation of the parcel;

(f)   Ad valorem taxes paid for each year between 1975 and 1980, inclusive;

(g)   Whether you as owner of the property are engaged in the cutting or removal of timber, or are engaged in the drilling for or the extraction of any oil, gas, coal, other minerals or other matter of value.

    (1)   If your answer to Interrogatory 1(g) is yes, state the type of activity in which you are engaged, the time period during which you have been engaged in such activity, the amount of timber, oil, gas, coal, other minerals or other matter of value that has been extracted or removed from the property, and the amount of gross income you have received as a result of the removal of said matter during your period of ownership.

(h)   All leases that presently exist or that have expired with respect to the property which authorize the cutting or removal of timber,  or authorize the drilling for or extraction of any oil, gas, coal, other minerals or other matter of value.

    (1)   For each lease described in your answer to Interrogatory 1(h), name the parties who hold or held said leases, the date on which the lease agreement was entered into and the termination date of the lease agreement;

    (2)   For each lease described in your answer to Interrogatory 1(h), state the amount of all royalty payments or other consideration received in exchange for the granting of said leases, and the amount of timber, oil, gas, coal, other minerals or other matter of value which was extracted or removed pursuant to said leases.

2.    As to each of the parcels of real estate identified in your answer to Interrogatory No. 1, please state whether such parcel is held subject to a mortgage.  As to each such mortgage, list the following information:

(a)  All written documents which concern such mortgage;

(b)  The name of the person or company who is the mortgagee; and

(c)  The outstanding balance of the mortgage.

3.    As to each of the parcels of real estate identified in your answer to Interrogatory No. 1, please state whether you have obtained a policy of title insurance to cover such property.  As to each such policy, list the following information:

(a)  All written documents which concern such title insurance; and

(b)  The name and address of the insurer title insurance company.

Respectfully submitted,

JUDY LEWIS MEGGESTO
Meggesto & Meggesto
The Hamilton White House
Suite 100
One Fayette Park
Syracuse, New York  13202
(315) 471-1664

Attorney for Plaintiffs

Of Counsel:

Arthur J. Gajarsa
Donald W. Hamaker
Kenneth A. Marra
Wender, Murase & White
Suite 650
1120 Twentieth Street, N.W.
Washington, D. C.  20036
(202) 452-8950

- 4 -

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK


THE CAYUGA INDIAN NATION, et al., )
                                  )
                     Plaintiffs,  )
                                  )
          v.                      )  Civil Action No. 80-CV-930
                                  )
HUGH L. CAREY, et al.,            )
                                  )
                     Defendants.  )

CERTIFICATE OF SERVICE

     I hereby certify that copies of the foregoing Plaintiffs'
Reply Memorandum In Support Of Class Certification and proposed
Order were mailed, this 27th day of January, 1981, to the
following parties:

                    Jeremiah Jochnowitz
                    Assistant Solicitor General
                    Department of Law
                    The Capitol
                    Albany, New York  12224
                    Attorney for the State of New York

                    Roy Pinsky, Esquire
                    Pinsky and Pliskin
                    Suite 1020
                    State Tower Building
                    Syracuse, New York  13202
                    Attorney for W.W. & F.H. Patterson, Jr. and
                     W.W. Patterson, Inc.

                    Howard M. Schmertz, Esquire
                    Huber, Magill, Lawrence & Farrell
                    99 Park Avenue
                    New York, New York  10016
                    Attorney for New York State Electric &
                     Gas Corporation

                    Richard D. Davidson, Esquire
                    Hiscock, Lee, Rogers, Henley & Barclay
                    Financial Plaza
                    P. O. Box 4878
                    Syracuse, New York  13221
                    Attorneys for Consolidated Rail Corp.

James D. St. Clair, Esquire
William F. Lee, Esquire
Hale and Dorr
60 State Street
Boston, Massachusetts  02109

Allan van Gestel, Esquire
Goodwin, Procter & Hoar
28 State Street
Boston, Massachusetts  02109

KENNETH A. MARRA

- 2 -